2011 VT 19

# In re Allen Hodgdon

[19 A.3d 598]

No. 10-001

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed February 10, 2011

*Eric R. Benson*, Westford, for Appellant.

*Stephen S. Blodgett* of *Blodgett, Watts & Volk, P.C.*, Burlington, for Appellee.

¶ 1. **Per Curiam.** Respondent Allen Hodgdon, an assistant judge for Essex County, appeals from a Judicial Conduct Board decision that he violated Canon 5(A)(3) of the Vermont Code of Judicial Conduct by failing to resign his judicial office upon becoming a candidate for the office of probate judge for Essex County. Respondent contends that: (1) Canon 5(A)(3) does not require an assistant judge to resign from office upon becoming a candidate for probate judge; (2) to the extent that it does contain such a requirement, Canon 5(A)(3) violates respondent's constitutional rights under the federal and Vermont constitutions; and (3) this Court should amend Canon 5(A)(3) retroactively so that it does not cover his conduct. We find no merit to the claims, but impose a sanction different from that recommended by the Board. We conclude that public confidence in the integrity of the judiciary is adequately preserved in this case by imposition of a public reprimand.

¶ 2. This case turns on the scope and constitutionality of what is commonly called a "resign to run" provision found in Canon 5(A)(3): "A judge shall resign from judicial office upon becoming a candidate for any elective office, except that a judge of probate or an assistant judge may be a candidate for reelection or may serve as town meeting moderator, provided that the judge complies with the provisions of Section 5C." A.O. 10, Canon 5(A)(3). We note that resign-to-run requirements are common in state law although their scope varies widely. The United States Supreme Court explained the rationale for such provisions in *Clements v. Fashing*, as follows:[1]

> That provision furthers Texas' interests in maintaining the integrity of the State's Justices of the Peace. By prohibiting candidacy for the legislature until completion of one's term of office, § 19 seeks to ensure that a Justice of the Peace will neither abuse his position nor neglect his duties because of his aspirations for higher office. The demands of a political campaign may tempt a Justice of

---

[1] The quoted language addressed a challenge to Article III, § 19 of the Texas Constitution, which prohibited specific officeholders, including a "judge of any court," from serving in the legislature during the term for which the officeholder was elected or appointed. The Court also addressed a resign-to-run requirement in Article XVI, § 65 of the Texas Constitution and said that the two constitutional clauses "serve essentially the same state interests." *Clements*, 457 U.S. at 970.

the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision. By contrast, it is to be expected that a legislator will vote with due regard to the views of his constituents.

457 U.S. 957, 968 (1982) (plurality opinion). In a pre-*Clements* decision, the United States Court of Appeals for the Fifth Circuit emphasized three purposes of a resign-to-run provision when applied to sitting judges: (1) "to prevent abuse of the judicial office by a judge-candidate during the course of the campaign," (2) "to prevent abuse of the judicial office by judges who have lost their electoral bids and returned to the bench," and (3) to eliminate "even the appearance of impropriety by judges both during and after the campaign." *Morial v. Judiciary Comm'n of State of Louisiana*, 565 F.2d 295, 302 (5th Cir. 1977).[2] The Reporter's Notes to Canon 5 explain that the purpose of the resign-to-run requirement is "to retain the appearance of judicial impartiality and to prevent distraction from judicial duties." Reporter's Notes, A.O. 10, Canon 5.

¶ 3. The material facts of this case are undisputed. Respondent was first elected to the office of Assistant Judge for Essex County in November 1990 and has served continuously in that office since February 1991. In 2006, while serving as an assistant judge, respondent became a candidate for Probate Judge for Essex County. He ran for both offices in the November 2006 election, and was successfully elected to the office of probate judge and reelected to the office of assistant judge. Thereafter, respondent served concurrently in both offices.

¶ 4. In April 2009, the Board initiated formal disciplinary proceedings against respondent, asserting that, by becoming a candidate for probate judge without resigning the office of assistant judge, he had violated Canon 5(A)(3). Following a hearing in

---

[2] In *Morial*, a Louisiana Court of Appeals judge ran for Mayor of New Orleans. The resign-to-run provision was contained in the Louisiana Code of Judicial Ethics and applied only to candidacy for nonjudicial office. See *Morial*, 565 F.2d at 297.

December 2009, the Board issued a written decision, finding by clear and convincing evidence that respondent violated the Canon. The Board imposed a suspension from the office of assistant judge for at least 30 days and thereafter until respondent resigned from either one of his judicial positions. This appeal followed.

¶ 5. We note at the outset that the findings and conclusions of the Board, although entitled to "great weight," are strictly advisory in nature. *In re Boardman*, 2009 VT 42, ¶ 12, 186 Vt. 176, 979 A.2d 1010 (per curiam) (quotation omitted). The ultimate decision in all judicial disciplinary matters rests with this Court, which is the final arbiter of the underlying scope and purpose of the Canons of Judicial Conduct as they apply to the judiciary of this state. *Id.*

¶ 6. Respondent first contends that the Board misinterpreted Canon 5(A)(3) to require that he resign his position as assistant judge upon becoming a candidate for election as probate judge. Respondent maintains that, properly understood, the Canon applies solely to judges who become candidates for "non-judicial" elective office, thereby excluding assistant judges who run for the office of probate judge or vice versa.

¶ 7. As with any other statute or rule, "our primary objective" in construing Canon 5(A)(3) "is to effectuate [its] intent." *Ice Center of Washington West, Inc. v. Town of Waterbury*, 2008 VT 37, ¶ 7, 183 Vt. 616, 950 A.2d 464 (mem.). The first step in the interpretive process is to examine the language of the Canon itself; "[w]hen the plain language is clear and unambiguous, our inquiry is at an end, and we enforce the [provision] according to its terms." *Id.*

¶ 8. Canon 5(A)(3) is facially unambiguous. It plainly provides that a judge shall resign from judicial office upon becoming a candidate for "*any* elective office," not any *nonjudicial* elective office. See *In re Colby*, 2009 VT 126, Order, 187 Vt. 582, 989 A.2d 553 (mem.) (observing that Canon states "unambiguously" that judge must resign "upon running for another office"). The Reporter's Notes explain that it applies to "any other office." Reporter's Notes, A.O. 10, Canon 5. As respondent points out, Canon 5 of the Vermont Code of Judicial Conduct is based on the 1990 revision of the American Bar Association Model Code of Judicial Conduct. Vermont Canon 5(A)(3) is taken from Canon 5(A)(2) of the ABA Model Code, but the Model Code's resign-to-

run requirement is applicable only when the judge runs for a "non-judicial office." American Bar Association, Model Code of Judicial Conduct, Canon 5(A)(2), at 30 (1990); see also J. Alfini, et al., Judicial Conduct and Ethics § 11.11, at 11-64 (4th ed. 2007). The Vermont drafting committee had the Model Code in front of it and changed the language to make the resign-to-run requirement applicable to candidacy for any office, whether judicial or nonjudicial. Rather than suggesting the deviation from the Model Code was inadvertent, as respondent argues, the drafting history indicates that it was intentional.[3] We cannot conclude that the language does not reflect the drafters' intent.

¶ 9. Respondent asserts, nevertheless, that ambiguity may be found in other sources. He cites Canon 5(C)(1), which states that "[e]xcept as provided in this Section C, a candidate for election or reelection as judge of probate or assistant judge shall comply with all applicable provisions of Sections 5A(1) and 5B." Respondent suggests that the omission of Section 5(A)(3) from this section raises some ambiguity concerning its scope and application. The argument is unpersuasive. Sections 5(A)(1), 5(B) and 5(C) all deal with specific political campaign activities that candidates for judicial office may, or may not, engage in. In contrast, Canon 5(A)(3) places a restriction on who may become a candidate for judicial office in the first instance. That Canon 5(A)(3) is not referenced in Canon 5(C)(1) is, therefore, consistent with the overall structure of Canon 5 and raises no ambiguity.

¶ 10. Respondent also cites 4 V.S.A. § 355, which provides that, when a probate judge is "incapacitated," his or her duties may be performed during the period of incapacity by either the register of probate, a probate judge from another district, or an assistant judge of the superior court in the same district. Again, this provision has no bearing on Canon 5(A)(3). That an assistant judge may temporarily perform the duties of a probate judge does not affect the clear import of Canon 5(A)(3), which is concerned with the broader implications of running for one judicial office while performing the duties of another. We thus find no ambiguity in this regard.

---

[3] While we have not surveyed all states, we note that Vermont is not the only state to apply its resign-to-run Canon language to candidacy for judicial office. See Virginia Canons of Judicial Conduct, Canon 5(A)(2).

■ ■ ¶ 11. Ultimately, respondent maintains that, even if the omission was intentional, the drafters' departure from the Model Code was "unreasonable" and "does not make any sense." The argument is essentially a variant of two others. One is that, however unambiguous, Canon 5(A)(3) nevertheless leads to absurd results that the drafters could not have intended. See *Chayer v. Ethan Allen, Inc.*, 2008 VT 45, ¶ 10, 183 Vt. 439, 954 A.2d 783 (holding that we may look beyond text of statute or rule where plain language "is unambiguous but would lead to an absurd result" that drafters "cannot have intended"). The other is that Canon 5(A)(3) serves no rational — much less compelling — purpose, and therefore deprives respondent of his constitutional rights. The latter assertion is addressed below. As to the former, it is sufficient to recall that the absurd-results doctrine applies only where a plain reading "would produce a result demonstrably at odds with any conceivable legislative purpose." *Judicial Watch, Inc. v. State*, 2005 VT 108, ¶ 16, 179 Vt. 214, 892 A.2d 191 (quotation omitted). Here, the Reporter's Notes to Canon 5(A)(3) explain that its purpose is "to retain the appearance of judicial impartiality and to prevent distraction from judicial duties." Although one could argue that running for reelection to one judicial office is as potentially compromising or distracting as running for election to two, there are certainly "conceivable" grounds to conclude otherwise. Judicial office is a public trust, not a personal privilege, and the Vermont public is assuredly entitled to require that assistant and probate judges devote their *entire* attention to the office to which they were elected and are currently serving, undistracted by the demands of campaigning for a different office. See, e.g., *Blair v. Harris*, 45 P.3d 798, 803 (Haw. 2002) (noting that Hawaii's broad resign-to-run requirement "encourages elected public officials to devote themselves exclusively to the duties of their respective offices") (quotation omitted)). The scope of the resign-to-run provision is not "absurd," and there is no reason not to enforce it according to its plain meaning.

¶ 12. Assuming that the Canon applies and that he violated its terms by failing to resign, respondent further maintains that Canon 5(A)(3) infringes his constitutional rights to freedom of speech and equal protection of the law. He also claims that the provision violates three provisions of the Vermont Constitution. We start with the federal constitutional claim under the Equal Protection Clause.

¶ 13. Respondent's main interest in this case is his right to run for elected office. In general, the federal courts have declined to hold that the right to run for elective office is "fundamental," a position that was applied in the seminal *Clements* decision. There, a plurality of the high court held that "[f]ar from recognizing candidacy as a fundamental right, we have held that the existence of barriers to a candidate's access to the ballot does not of itself compel close scrutiny." 457 U.S. at 963 (quotation omitted); see also *Bullock v. Carter*, 405 U.S. 134, 143 (1972) (observing that the fact a state sets regulations "tending to limit the field of candidates from which voters might choose . . . does not of itself compel close scrutiny"). Thus, with the exception of classifications based on wealth or minor-party status, *Clements* held that ballot-access restrictions are subject to a general balancing test "involv[ing] a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions." 457 U.S. at 963.

¶ 14. *Clements* applied the balancing test to a resign-to-run restriction contained in the Texas constitution and applicable when the officials designated in it, including judges, were over a year away from the end of their term of office. It rejected an equal-protection challenge by several Texas judges hoping to run for the higher judicial office without being forced to resign. As discussed above, the Court observed that the law served the purpose, among others, of ensuring that a judge will not neglect duties or devote less than the judge's full time and energies to the responsibilities of the judicial office. *Id.* at 968. Conversely, the Court noted that the burden on potential candidates, who were not barred from running for office as they neared the end of their term, was relatively minimal. *Id.* at 971-72. Accordingly, the Court had no difficulty upholding the resign-to-run law at issue. *Id.* at 972-73.

¶ 15. Numerous courts have since adopted and applied the *Clements* balancing test to uphold similar resign-to-run provisions, generally concluding that the state's interests substantially outweighed the limited impact on office seekers forced to run for one office at a time. See, e.g., *Joyner v. Mofford*, 706 F.2d 1523, 1532 (9th Cir. 1983) (rejecting equal-protection challenge to Arizona Constitution resign-to-run clause and finding that it "advances

substantial and important state interests, while placing a minimal burden on potential candidates"); *Worthy v. Michigan*, 142 F. Supp. 2d 806, 815 (E.D. Mich. 2000) (holding that Michigan rule barring sitting judges from nonjudicial offices did not violate equal protection); *Fasi v. Cayetano*, 752 F. Supp. 942, 946-54 (D. Haw. 1990) (rejecting equal protection and First Amendment challenges to resign-to-run clause in Hawaii Constitution); *Acevedo v. City of North Pole*, 672 P.2d 130, 135-36 (Alaska 1983) (holding that state's interests were "sufficiently important to justify the" rule prohibiting dual office-holding); *In re Dunleavy*, 2003 ME 124, ¶ 22, 838 A.2d 338 (holding that resign-to-run provision of Maine Judicial Code of Conduct "does not violate the guarantees of equal protection, freedom of speech, or freedom of association in either the Maine or United States Constitutions"); *State ex rel. Carenbauer v. Hechler*, 542 S.E.2d 405, 420 (W. Va. 2000) (concluding that constitutional provision forcing judges to vacate office before running for nonjudicial office was supported by "State's compelling and permissible interest"); *Wagner v. Milwaukee County Election Comm'n*, 2003 WI 103, ¶ 78, 666 N.W.2d 816 (holding that state's "legitimate interests" in enacting constitutional provision prohibiting judges from holding other public office "far outweigh the burdens put upon the petitioner's right to be a candidate for office").

■■■ ¶ 16. Respondent's constitutional arguments are less about whether resign-to-run restrictions are constitutional in general and more about the specific restriction at issue in this case. He challenges the rationality of applying the resign-to-run restriction to candidacy for a judicial office, of restricting only judges, and of not including judges who seek appointive office. These arguments are addressed directly by *Clements*. The Texas constitutional provision in that case applied to candidacy for any office, judicial or nonjudicial. *Clements*, 457 U.S. at 960. The Court noted that it restricted the plaintiffs, justices of the peace, from seeking higher judicial office, but nevertheless upheld the restriction. *Id.* at 962. The plaintiffs in *Clements*, like respondent here, challenged the scope of the resign-to-run provision, specifically its limitation to only certain elected officials. The Court responded that the state was not required to address all of the perceived problems at once, but could proceed "one step at a time." *Id.* at 970. The response applies here. The resign-to-run restriction applies only to judges because it is imposed by this Court, and we have power only over

judges. It reflects the national recognition, however, that we must protect the fairness, and perceived fairness, of judicial decision-making and minimize the distraction of election campaigns. There is no such national recognition with respect to steps taken to obtain an appointed office.

¶ 17. Respondent has urged us to view the equal protection challenge not in light of the broad rationales of *Clements*, but instead under the unique circumstances of part-time judicial offices in a small Vermont county. We note, however, that we have one code for all judges in the state and cannot fine-tune it to the circumstances in each election in each county. There are, however, circumstances in this case that are relevant to the policy behind the application of the Canon. The only two elected judgeships in Vermont are interrelated because the assistant judge sits in the superior court on de novo appeals from the probate court. The same interrelationship would be present if an appointed judge ran to become an elected assistant or probate judge. The court in *Morial* noted a primary rationale behind any resign-to-run provision applicable to a judge: "By requiring a judge to resign at the moment that he becomes a candidate, the state insures that the judge will not be in a position to abuse his office during the campaign by using it to promote his candidacy." 565 F.2d at 303. The United States Supreme Court adopted the same rationale in *Clements* and noted that "[t]he State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision." *Clements*, 457 U.S. at 968. In explaining this rationale, we emphasize that there is no evidence that respondent misused his office as assistant judge. We have a prophylactic resign-to-run rule to avoid any case-by-case inquiry into the actions of a judge while the judge is running for a different office.

¶ 18. Respondent raises a second constitutional challenge under the United States Constitution — that the resign-to-run restriction violates respondent's First Amendment rights by blocking his ability to express his political views by running for office and by denying the voters the ability to elect the candidate of their choice. Here again, the United States Supreme Court has instructed that the standard for evaluating such claims requires a balancing of the "character and magnitude" of the rights affected against the state interests advanced by the rule. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (reaffirming cases holding that

a "flexible standard" governs First Amendment challenges to ballot-access restrictions and recognizing that when state election laws impose "reasonable" content-neutral ballot-access restrictions "the State's important regulatory interests are generally sufficient to justify the restrictions" (quotation omitted)). Applying this standard, courts have uniformly concluded that the public interests advanced by resign-to-run laws justify any temporary and content-neutral restriction affecting candidates and voters. See, e.g., *Clements*, 457 U.S. at 971 (observing that rejection of claimants' equal-protection claim also "disposes" of their related argument that Texas resign-to-run clause violates First Amendment and characterizing claimants' "First Amendment interests in candidacy" as "insignificant"); *Morial*, 565 F.2d at 302 (holding that any impairment of candidates' and voters' First Amendment interests was "not sufficiently grievous" to invalidate Louisiana statute requiring judge to resign office before becoming candidate for nonjudicial office); *Worthy*, 142 F. Supp. 2d at 816-18 (holding that state's interests in prohibiting sitting judges from running for nonjudicial office justified temporary inability of voters to choose specific candidate); *Adams v. Supreme Court of Pa.*, 502 F. Supp. 1282, 1292 (M.D. Pa. 1980) (concluding that standard of judicial conduct requiring sitting judges to resign upon becoming candidate for nonjudicial office did not violate First Amendment rights of judge in light of "important state interests" served by rule); *In re Buckson*, 610 A.2d 203, 224 (Del. 1992) (holding that resign-to-run requirement in Delaware Judges' Code of Judicial Conduct did not violate First Amendment interests of judges). In view of the substantial interests underlying Canon 5(A)(3), discussed earlier, we similarly conclude that Canon 5(A)(3) does not unconstitutionally burden any First Amendment rights.

¶ 19. We move to respondent's arguments under the Vermont Constitution. Although respondent's arguments rely on a number of constitutional provisions together, we find it helpful to look at the provisions separately, at least initially. We start with Chapter II, § 54, which provides that certain offices are incompatible and the same person cannot hold more than one of these offices. Respondent points out that the offices of probate judge and assistant judge are not considered to be incompatible under this section. He quotes from this Court's decision in *Baker v. Hazen* that § 54 "represents a denial of a right to a citizen" and unless it can "be clearly demonstrated that he falls within its proscrip-

tion, or equally plainly shown that he is in violation of its purpose, he is entitled to be held free of its prohibition." 133 Vt. 433, 437, 341 A.2d 707, 710 (1975). From this quote, he argues that Canon 5(A)(3) violates § 54 because he must be entirely free of its prohibition.

¶ 20. In response, we emphasize that Canon 5(A)(3) and Chapter II, § 54 respond to different, albeit related, concerns. The constitutional provision imposes a restriction on who may hold certain offices. The Canon restricts a judge from running for a different elected office. Thus, as respondent points out, a nonjudge could run for and serve as both an assistant judge and a probate judge at the same time. As the purposes of the Canon reflect, the resign-to-run rule is based on the judge's conduct during the election and not on the performance of the responsibilities of the office after the election. Moreover, we do not read *Baker* as broadly as respondent does; § 54 is not necessarily the only source of incompatible office regulation. For these reasons, we agree with the decision of the Maine Supreme Judicial Court in *In re Dunleavy*, 2003 ME 124, ¶ 21, in upholding its version of the resign-to-run Canon against an attack based on the incompatible offices provision of the Maine Constitution. As the court held, the Canon and the constitutional provision are not in conflict and the Judicial Conduct Code could provide "a more exacting restriction for judges than is provided in the constitution." *Id.*

¶ 21. The second Vermont constitutional provision relied upon by respondent is Chapter I, Article 8, which provides that "voters, having a sufficient, evident, common interest with, and attachment to the community, have a right to . . . be elected into office, agreeably to the regulations made in this constitution." Respondent argues that he has a right to "be elected into office" unless there is some applicable limitation in the Constitution and there is no such limitation. To be sure, by its plain terms Article 8 provides that the voters have a right "to elect officers" and "be elected into office," but we do not read this provision as conflicting with Canon 5(A)(3). Nothing in the Code of Judicial Conduct prohibits an assistant judge from being elected to the office of probate judge, or vice versa; it merely prohibits the judge from *retaining* one office while seeking the other. Indeed, similar constitutional provisions in other states have been construed in precisely this manner. In *Mulholland v. Ayers*, 99 P.2d 234,

237-38, 240 (Mont. 1940), for example, the court held that the state's constitutional clause guaranteeing that "[a]ny person qualified to vote at general elections and for state offices in this State shall be eligible to any office therein" did not invalidate a resign-to-run statute whose purpose was "to discourage a person already holding one office . . . from retaining that office while endeavoring to obtain another." (quotation omitted). As the court explained, the statute was "simply a limitation upon the right to retain the office already held when seeking another. It is not a limitation upon the right to seek another office. The incumbent of an office has the choice under the statute to retain it unmolested, or give it up and seek another." *Id.* at 239; see also *Hill v. Galliher*, 65 So. 3d 362, 377 (Ala. 2010) (upholding resign-to-run provision against challenge that it unconstitutionally added qualification to run for office, observing that it merely "established requirements for retaining employment" (quotation and emphasis omitted)); *Holley v. Adams*, 238 So. 2d 401, 406 (Fla. 1970) (rejecting claim that resign-to-run statute was unconstitutional qualification for office, ruling that it was merely limitation upon right to retain one office while seeking another). But see *Moore v. Knightdale Bd. of Elections*, 413 S.E.2d 541, 544-45 (N.C. 1992) (holding that specific wording of constitutional qualifications clause invalidated resign-to-run statute). Thus, other jurisdictions construing similar constitutional provisions have found no impediment to resign-to-run provisions that seek, like Canon 5(A)(3), to ensure that government officials devote all their time and energy to the public office in which they are currently serving undistracted by candidacy for another office.

¶ 22. We conclude that Canon 5(A)(3) does not violate Chapter I, Article 8 for the reasons explained in the above cases. We add only that the right given in Article 8 is subject "to the regulations made in this constitution," including the disciplinary authority residing in this Court with respect to "all judicial officers." Vt. Const., Chapter II, § 30. Judicial elections present unique ethical issues that require regulation of how elections are conducted, subject to discipline for noncompliance. See A.O. 10, Canon 5. This regulation does not interfere with the right of a judge to be elected to a public office, but it may control how the judge must conduct a campaign, including whether the judge can remain in the judicial office while the campaign is conducted. We

view this regulation as grounded in the disciplinary authority of the Court specifically authorized in the Constitution.

■ ¶ 23. We turn now to whether the resign-to-run provision of Canon 5(A)(3) violates the Common Benefit Clause of the Vermont Constitution, Chapter I, Article 7. We have recently summarized the inquiry in common benefit cases: (1) what "part of the community" is disadvantaged by the legal requirement; (2) what is the governmental purpose in drawing the classification; and (3) does the omission of part of the community from the benefit of the challenged law bear "a reasonable and just relation to the governmental purpose?" *Badgley v. Walton*, 2010 VT 68, ¶ 21, 188 Vt. 367, 10 A.3d 469 (quotation omitted). Factors to be considered in the third inquiry are the significance of the benefits and protections of the challenged law, whether the omission of members of the community from the benefits and protections of the challenged law promotes the government's stated goals, and whether the classification is significantly underinclusive or overinclusive. *Id.* This is a different standard from that used in most federal equal protection cases, see *id.* ¶ 39, although there are overlaps in the analytical approach.

¶ 24. The first two questions in the inquiry are similar to those employed in the equal protection analysis above. The disadvantaged class consists of judges who run for elective office. The purpose of the resign-to-run provision is to "retain the appearance of judicial impartiality and to prevent distraction from judicial duties." Reporter's Notes, A.O. 10, Canon 5(A)(3). Although we agree that the constitutional right to hold elective office is a very important interest, we also weigh heavily the interest in ensuring the impartiality and commitment to duties of the judge. We are in a situation where the governmental interest can be protected only by a prophylactic rule of the type before us. It would be difficult to determine whether any specific judge's decision is affected by the judge's candidacy for another office or whether the judge's work effort is affected by campaign activities for another office. Indeed, the judge's role depends upon public trust and confidence that can be undermined by the appearance of conflicting interests or obligations. We agree with the United States Supreme Court in *Clements* that "the State's interests are especially important with regard to judicial officers" and that it "is a serious accusation to charge a judicial officer with making a politically motivated decision." 457 U.S. at 968.

¶ 25. For much the same reasons as the federal courts have employed, we hold that the resign-to-run rule meets the requirements of our Common Benefit Clause. As with his equal protection argument, respondent attacks the reasonableness of imposing the requirement only on judges and with respect to any elected office and no appointive office. He also argues that the rationales don't apply to him as a part-time assistant judge in a rural county. Some of these arguments may be persuasive as policy arguments, but are insufficient as constitutional arguments. Despite its imperfections, the resign-to-run rule contained in Canon 5(A)(3) is reasonably and justly related to the legitimate interests that underlie it.

¶ 26. While this appeal was pending, respondent filed a motion with the Court to amend Canon 5(A)(3) retroactively to comport with the Legislature's recent enactment of 4 V.S.A. § 278 and to eliminate the finding that he violated the Canon. In pertinent part, the statute provides that: "An assistant judge or a candidate for the office of assistant judge may also seek election to the office of probate judge, and, if otherwise qualified and elected to both offices, may serve both as an assistant judge and as probate judge." 4 V.S.A. § 278(a). The statute was effective on passage, June 3, 2010, see 2009 (Adj. Sess.), No. 154, §§ 17a, 239(d), and operates prospectively. See *Town of Sandgate v. Colehamer*, 156 Vt. 77, 90, 589 A.2d 1205, 1212-13 (1990) (holding that statutes operate prospectively unless they contain clear language mandating retroactive application). In effect, respondent argues that the statute amends the Canon and requests that amendment be made retroactive even though the statute is not retroactive.[4]

¶ 27. We have held that respondent violated Canon 5(A)(3) by running for probate judge while he held the office of assistant judge. The fact that he could hold both of those offices is not the point. Even if we can amend the Canon retroactively, a question we do not decide, it would not change the fact that his conduct was unethical at the time it occurred.

¶ 28. We have carefully separated our adjudicative procedures from our rule-making procedures. The latter normally starts with an advisory committee of lawyers and judges, and in some

---

[4] Apparently, the statutory section was passed in response to this disciplinary proceeding although it does not mention Canon 5(A)(3).

instances members of the public, who work with a professional reporter in considering possible amendments to rules and their language. We also have a public comment process on proposals from the advisory committees. These procedures are critical because rules, including judicial ethics rules, affect many people, not least the citizens of Vermont who use our courts, and good rule-making requires the involvement of many interested persons. We can find no instance where we bypassed these procedures and amended rules in the course of an adjudicative proceeding. We do not find it appropriate to do so here.

¶ 29. Nevertheless, we recognize that there exists a potential conflict between the new statute and Canon 5(A)(3), a potential conflict that implicates the separation of powers between the coordinate branches of government. Accordingly, we ask the civil rules committee to consider whether Canon 5(A)(3) should be amended in light of the enactment of 4 V.S.A. § 278. In making this request to the committee, we express no opinion on whether the Canon should be amended or, if so, how it should be amended.

¶ 30. We turn to the question of sanctions. The Board imposed a sanction of (1) a thirty-day suspension from the office of assistant judge, and (2) a continuing suspension thereafter until respondent resigns from one of the two judicial offices he holds. In reaching this decision, the Board noted that this is a companion case to In re Colby, 2009 VT 126, in which the other assistant judge in Essex County ran for election to a town selectboard while holding the judicial office and was found to have violated Canon 5(A)(3). The sanction the Board imposed here was the same as that imposed on Judge Colby and upheld by this Court. Id. ¶ 1.

¶ 31. As we have often stated, the primary purpose of judicial discipline is to "preserve and enhance public confidence in the integrity and fairness of the justice system." In re O'Dea, 159 Vt. 590, 604, 622 A.2d 507, 515 (1993) (per curiam); accord In re Kroger, 167 Vt. 1, 16, 702 A.2d 64, 73 (1997) (per curiam); In re Steady, 161 Vt. 636, 637, 641 A.2d 117, 118 (1994) (mem.). Several considerations persuade us that this case is different from Colby and any damage to the integrity of the judiciary that may have resulted from this case is adequately redressed by the imposition of a public reprimand.

¶ 32. First, we emphasize our point of agreement with the Board. Although the Preamble to the Code acknowledges that not "every transgression" must result in disciplinary action, we believe that a public sanction here is appropriate. Notwithstanding respondent's claim of ambiguity, we find that the language of Canon 5(A)(3) is clear and straightforward and that respondent's violation of the Canon was patent and indisputable. Although respondent claims that he relied on a legal opinion from his attorney to the contrary, as we have pointed out, a violation need not be willful to cause public harm or warrant public censure. See *Kroger*, 167 Vt. at 6, 702 A.2d at 67 (where judge's behavior transgresses high standards of Judicial Code, sanctions may be imposed even where "the judge sincerely believed [the conduct] to be appropriate and correct").

¶ 33. At the same time, we do not believe that the more severe sanction recommended by the Board — a thirty-day suspension and compulsory resignation from one of respondent's two current judicial offices — is necessary or appropriate. First, respondent's lengthy record of judicial service is otherwise entirely free of prior conduct violations, and we are not persuaded that a suspension from office is necessary to restore public confidence in either respondent's integrity or in the judiciary's integrity as a whole. See *Kroger*, 167 Vt. at 15, 702 A.2d at 72 (noting general rule that judge's isolated instance of misconduct must be balanced against prior unblemished record). Second, we take judicial notice that respondent was not a candidate in the November 2010 general election for reelection to the office of assistant judge, and therefore will — as a matter of course — vacate that office at the end of January of 2011. See Vt. Const., Ch. II, § 50. Requiring respondent's resignation shortly before the natural end, of his term would serve little practical or remedial purpose compared to the greater administrative inconvenience caused by the temporary vacancy. Finally, we note that, however patent respondent's violation of Canon 5(A)(3), it has resulted in no charge or evidence of any actual conflict of interest or neglect of duty by respondent. Accordingly, we conclude that a public reprimand is the appropriate sanction for the violation.

*Judge Allen Hodgdon is hereby publicly reprimanded for violating Canon 5(A)(3) of the Code of Judicial Conduct.*